UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Sylvester J. Thomasson, | ) C/A No. 4:11-0686-DCN-TER |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) REPORT AND RECOMMENDATION |
| | ) |
| Joan Tapper, P.A.; | ) |
| Dr. Lorenzo Guevara, | ) |
| | ) |
| Defendants. | ) |

**PROCEDURAL BACKGROUND**

The Plaintiff, Sylvester J. Thomasson ("Plaintiff/Thomasson"), filed this action on March 22, 2011, alleging various claims for violations of his constitutional rights pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).[1] Plaintiff alleges that his constitutional rights were violated due to medical indifference by Defendant Tapper who he alleges did not give him proper care for his foot. Plaintiff alleges Defendant Guevara lost his BP-8 and BP-9 forms which he had submitted to his Counselor which resulted in "stalling" his administrative remedies process. Defendant Tapper is employed as a Family Nurse Practitioner for

---

[1] In Bivens, the Supreme Court established a cause of action against federal officials for the violation of federal constitutional rights. A Bivens claim is analogous to a claim under 42 U.S.C. § 1983. Harlow v. Fitzgerald, 457 U.S. 800, 814-820 (1982). Case law involving § 1983 claims is applicable in Bivens actions and vice versa. Id.. *See also* Osabutey v. Welch, 857 F.2d 220, 221-223 (4th Cir.1988).

the United States Public Health Services and was assigned to FCI Edgefield from March 29, 2010, to April 26, 2011. (See doc. #39-2, Tapper declaration). Defendant Guevara is the Assistant Health Services Administrator at FCI Edgefield and a Mid-Level Practitioner. (See doc. #39-3, Guevara's declaration).

Defendants filed a motion to dismiss, or in the alternative, a motion for summary judgment on July 15, 2011. Because Plaintiff is proceeding pro se, the court issued an order on or about July 26, 2011, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the Defendants' motion to dismiss/summary judgment and the possible consequences if he failed to respond adequately. On August 9, 2011, Plaintiff filed a motion for appointment of counsel. The undersigned also construed the motion as a motion for extension of time to respond to the Defendants' motion. Plaintiff's motion for appointment of counsel was denied and Plaintiff was given until October 7, 2011, to file a response to Defendants' motion. Also, Plaintiff was advised that his case may be dismissed pursuant to Rule 41(b) of the Federal Rules of Civil Procedure if he failed to file a response. Plaintiff failed to file a response. Therefore, the undersigned entered a report and recommendation on October 11, 2011, recommending dismissal for failure to prosecute pursuant to Rule 41b of the Federal Rules of Civil Procedure.

On October 20, 2011, Plaintiff filed objections to the report and recommendation. Therefore, the Honorable David C. Norton, Chief United States District Judge, remanded this case to the undersigned for further review of "plaintiff's objections to the Report and Recommendation." (Doc. #64).

## **DISCUSSION**

The Plaintiff is an inmate currently housed at the Federal City Shelter Health Center in Washington, DC. At the time of the allegations raised in the complaint, the Plaintiff was incarcerated at the Federal Correctional Institution in Edgefield, South Carolina. ("FCI- Edgefield"). Before the undersigned is the Defendants' motion to dismiss, or, alternatively, motion for summary judgment. (Doc. # 39.)[2] As matters outside of the pleadings were submitted for review, the motion is being treated as one for summary judgment.

## **STANDARD FOR SUMMARY JUDGMENT**

The federal court is charged with liberally construing the complaints filed by pro se litigants, to allow them to fully develop potentially meritorious cases. See Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972). The court's function, however, is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, Weller v. Dep't of Social Servs., 901 F.2d 387 (4th Cir. 1990), nor can the court assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. Fed. R. Civ. P. 56(c).

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

---

[2]All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), DSC. Because this is a dispositive motion, the report and recommendation is entered for review by the district judge.

Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324 (Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves). Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with . . . affidavits, if any." Id. at 322; see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

**EXHAUSTION**

Defendants pleaded the affirmative defense of failure to exhaust remedies and submitted the declarations of James Johnson ("Johnson") and Tami Cassaro (Cassaro) in support of their position. Johnson states that he is employed as a Correctional Counselor at the FCI-Edgefield for the United States Department of Justice, Federal Bureau of Prisons ("BOP"). (Johnson declaration). Included in his ordinary course of officials duties, Johnson provides administrative remedies to inmates assigned to his case load. Id. Thomasson was incarcerated at FCI Edgefield from August 6, 2010, to June 15, 2011, and assigned to Johnson's caseload. Id. As a Counselor, Johnson has access to the BOP records which includes inmate administrative remedies and location information. Id. The Administrative Remedy Database reveals that Plaintiff filed a Request for Administrative Remedy (BP-9) dated December 21, 2010, and marked it "Sensitive BP-9" alleging he had filed an Informal Resolution Form (BP-8) claiming that Physician Assistance Tapper had mistreated him while he was in the Special Housing Unit between October 9, 2010, through October 29, 2010, and that he had not received a response to his BP-8. Id. This BP-9 was rejected on January 19, 2011, because it was untimely, not being filed within 20 days from the date of the alleged incident, and Plaintiff did not provide specific information about his request. Id. Instead of re-filing the BP-9 with documentation proving he had filed an Informal Resolution Form and without appealing the Warden's decision at the second level of the process to the Regional Director, Plaintiff appealed the rejection directly to the third level of the process, the Central Office. Id. However, it was rejected on April 7, 2011, because Plaintiff had purposefully by-passed filing an appeal with the Regional Director. Id. Johnson asserts he reviewed the Unit Administrative Remedy Log Book, ("Log Book") which is a manual log maintained by the Unit Team for tracking administrative remedy forms supplied to the inmates

assigned to his unit. Id. The Log Book indicated Plaintiff did not request a BP-8 from Johnson in regard to staff misconduct by Ms. Tapper in the months of October, November, or December before he submitted the BP-9. Id. Johnson attached a "true and correct" copy of said Log as Attachment 1. Id. The Log Book reflected that Johnson issued a BP-8 to Plaintiff on January 4, 2011, where he alleged mistreatment by Ms. Tapper, but the matter could not be informally resolved so he issued Plaintiff a BP-9 at his request on April 12, 2011. Id. Plaintiff never returned said BP-9 to Johnson to be submitted to the Administrative Remedy Coordinator as required. Id. The Log Book also revealed Johnson issued Plaintiff another BP-8 on February 18, 2011, where Plaintiff alleged staff misconduct by Ms. Tapper. Plaintiff was issued a BP-9 on April 12, 2011, after the matter could not be resolved informally. Id. However, Plaintiff did not return the BP-9 to Johnson for submission. Id.

Plaintiff was issued a BP-8 on February 23, 2011, where Plaintiff claimed Lorenzo Guevara did not complete the BP-8 he submitted to him about Ms. Tapper and was stalling his paperwork. Id. As the matter could not be resolved, Johnson gave Plaintiff a BP-9, which he submitted with those issues. Id. The request was denied by the Warden on April 24, 2011. Id. The investigation revealed that Plaintiff's BP-8 was addressed in a timely manner. As to the staff misconduct, the Warden informed Plaintiff that he did not provide specific information regarding any misconduct. Id. Johnson declares that at no time did he inform Plaintiff that Lorenzo Guevara or any other staff member lost a BP-8 and/or a BP-9 that he had submitted in regard to staff misconduct by Ms. Tapper. Id.

Defendants submitted the declaration of Tami Cassaro who asserts she is employed as a Supervisory Attorney for the BOP and is assigned to the South Carolina Consolidated Legal Center.

(Cassro declaration). As part of her ordinary course of duties, she provides legal assistance to staff at the four federal prisons located within the state of South Carolina and has access to the BOP records and official databases concerning, among other things, inmate administrative remedies and location information. Id. Throughout her entire career with the BOP, Cassaro has been involved in the processing of inmate administrative remedies and has investigated and prepared responses to requests at all three levels of review. Id. In her declaration, Cassaro set out the steps and timing of the administrative remedy process. Id. The time frames are set out in federal regulation. Id. All formal requests are logged into the national database and are given a unique identifying number and an extension is added to the number which denotes the level which the claim is filed. Id. Subsequent appeals of an issue will have the same identification number with a different extension identifying the level where filed. Id. All attempts to file a formal request, even if rejected for procedural reasons, are logged in the national database. Id. Informal requests are not logged into the national database. Id. A review of the Administrative Remedy log details all formal requests by Plaintiff and shows that he has not exhausted his remedies available under the formal Administration Remedy procedure established by the BOP concerning any of the allegations in his complaint. Id. The records reveal Plaintiff used the BOP's administrative remedy process in the past and since the time this suit was filed. Id. He has either filed or attempted to file forty (40) grievances while in BOP custody, eleven of which he filed since he was at FCI Edgefield. Id. On December 21, 2010, Plaintiff submitted a Request for Administrative Remedy BP-9 asserting he had filed a BP-8 claiming Tapper had mistreated him while he was in SHU between October 9, 2010, through October 29, 2010, but he had not received a response to his BP-8. Id. This BP-9 was rejected on January 19, 2011, because it was untimely and he did not provide specific information about his request. Id. Instead of re-filing

this BP-9 with documentation proving that he filed an Informal Resolution Form[3] and without appealing the Warden's decision at the second level of the process with the Regional Director, Plaintiff appealed directly to the third level of the process, the Central Office. On April 7, 2011, Plaintiff's Central Office appeal was rejected because he intentionally by-passed filing an appeal with the Regional Director. Id.  The Central Office also noted the initial institutional grievance was filed untimely. Id.  There is no evidence that Plaintiff ever re-submitted this grievance with the institution. Id. On or about March 1, 2011, Plaintiff filed another BP-9 at the institution alleging that his paperwork was being stalled and his life was at risk because of Ms. Tapper's actions. Id.  On April 24, 2011, the Warden responded to the grievance and denied the request explaining that the investigation revealed the Informal Resolution forms submitted to Health Services were addressed in a timely manner and that he did not provide any specific information regarding his life being at risk by Tapper. Id. On June 3, 2011, Plaintiff appealed the Institution's response to the Regional Office, which rejected it for being untimely. Id.  In the rejection, Plaintiff was informed that he could re-submit his grievance with verification from staff, on BOP letterhead, that he was not responsible for the untimely filing of his appeal. Id.  Plaintiff did not re-submit a BP-10 with such staff verification but instead appealed his rejection to the Central Office where it was rejected as untimely. Id. ( See Administrative remedies, attachments, #1-3 to Cassaro declaration).

      The BOP regulations set forth a three-tiered process for an inmate to seek redress for the alleged deprivation of any right. *See* 28 C.F.R. § 542.10. The Federal Bureau of Prisons has established an administrative procedure whereby a federal inmate may seek review of complaints

---

[3] There is no allegation by Plaintiff that he attempted to comply with their directions.

relating to any aspect of his or her confinement. *See* 28 C.F.R. § 542.10, which was cited in Williams v. O'Brien, 792 F.2d 986, 987 (10th Cir.1986).

The plaintiff may informally attempt to resolve the complaint with a staff member. 29 C.F.R. §542.13(a). If informal resolution is not successful, the inmate may file a formal written complaint to the warden. This complaint must be filed within twenty (20) calender days from the date on which the basis for the complaint occurred. 28 C.F.R. §542.14(a). If the inmate is not satisfied with the Warden's response, that response may be appealed to the Regional Director. An inmate who is not satisfied with the Regional Director's response may submit an appeal to the General Counsel within thirty (30) calender days of the date the Regional Director signed the response. 28 C.F.R. 542.15(a), 418 U.S. 539, 557 (1974). The Plaintiff "has no alternative but to comply" with these administrative procedures. Williams v. O'Brien, supra, 792 F.2d at 987. *See also* 28 C.F.R. § 542.10 through § 542.16. (See also Cassaro declaration, doc. #39-4).

Based on a review of the filings in this case, Plaintiff has failed to properly exhaust his administrative remedies. Accordingly, it is recommended that Defendants' motion for summary judgment (doc. #67) be granted for failure to exhaust administrative remedies. In the alternative, the claim will be addressed on the merits.

**ANALYSIS**

Plaintiff alleges Defendant Tapper mistreated him from October 9, 2010, until October 29, 2010. With regard to Defendant Tapper, Plaintiff alleges as follows:

> On 9-5-10 at 8:15 until 8:30 pm I was in a[n] altercation and placed in Special Housing Unit, (S.H.U.), I was taken to be seen by P.A. Tapper, and she said I was alright, but I wasn't.

> I have two marks on the left side of my head from the altercation. I was taken to D. Wing cell 104. The very next day, I notice my right foot has swollen, and I began to complain about my right foot.
>
> From 9-6-10 until 9-10-10- when Lt. Finnerty saw my foot, he ran and brought back Dr. Lopez and he had me to see Dr. Blocker, who had me taken and hospitalized at Edgefield Hospital for one week.
>
> I returned on 9-17-10 . . .
>
> . . .
>
> I then waited a week or so for my bandages to be changed and P.A. Tapper would not change my bandages until I wrote Mrs. Rosserio and tell her I'm being neglected by P.A. Tapper.
>
> When she (meaning P.A. Tapper) came she had the officer's bring me around to her office just to give me some bandages, when she could have brought that to me herself. I never seen her again until 10-8--10 at 7:20 am, and I told her my foot is reinfected and I need help. I would cry in pain because I really need help.

(Complaint).

Plaintiff asserts that he requested bandages from P.A. Tapper when she came to give him his insulin shot which she did not bring to him. Plaintiff also alleges Defendant Tapper called him a "crying baby ass nigger." (Complaint, entry 1-2, p. 4). Therefore, Plaintiff asserts Defendant Tapper mistreated him from October 9, 2010, up until October 29, 2010.

Defendants submitted the declaration of Joan Tapper who states that she is employed as a Family Nurse Practitioner for the United States Public Health Services (PHS) and assigned to the Wewoka Indian Health Services in Oklahoma. Tapper was assigned to FCI Edgefield from March 29, 2010, to April 26, 2011, where she provided medical care to inmates as part of the ordinary course of her duties. (Tapper declaration). Plaintiff was incarcerated at FCI Edgefield from August 6, 2010, to June 15, 2011. Id. A review of Plaintiff's medical records from the period he alleges, shows Tapper was one of many medical staff who provided care to Plaintiff. Id. Plaintiff had several

10

chronic medical conditions including diabetes which he received insulin injections twice daily during pill time. Id. The medical records indicate that Tapper gave Plaintiff insulin shots and other pill line medication on at least five occasions from the date of his arrival while he was placed in the SHU. Id. On September 5, 2010, Plaintiff was brought to the Health Services Department for an injury assessment after being involved in an altercation with another inmate. Id. Tapper assessed Plaintiff's injuries and, during the examination, Plaintiff refused to talk or answer any questions. Id. The examination revealed Plaintiff only had a small abrasion on his forehead which she cleaned and counseled Plaintiff on how to care for the abrasion. Id. At the time of said examination, Plaintiff did not complain of a sore or pain on his right foot and no sore was observed. Id. After Tapper examined Plaintiff, he was placed in SHU, and, while there, continued to receive his insulin injections and other medication both from Tapper and other medical staff. Id. Plaintiff was hospitalized from September 10, 2010, through September 17, 2010, for an abscess on his right foot relating to his diabetes. After being released from the hospital, Plaintiff returned to the SHU at FCI Edgefield and continued to be seen by medical staff during pill line and sick call.  Tapper saw Plaintiff on October 13, 2010, for a dressing change in the SHU medical room where they are brought for privacy and security reasons as bandages are not changed in an inmate's cell. Id. Tapper's examination of Plaintiff revealed no drainage or open areas on his right foot although he appeared to have some maceration between the 4th and 5th toes but Plaintiff did not complain of any pain. Id. Tapper asserts the medical records do not indicate she saw Plaintiff on October 9, 2010, as alleged. Id. Tapper saw Plaintiff again on October 29, 2010, when he complained his right foot was dry and cracking, and he did not have the money to buy medication from the commissary. Id. Tapper cleaned and applied antifungal cream to the foot, and gave Plaintiff a prescription for the cream which she explained the pharmacy would fill

at no charge. Id. At that time, Plaintiff became very angry and argumentative because he wanted the medication then. Id. However, Tapper explained to him that was not the process, and she did not have a tube to give him. Id. Tapper performed a follow-up examination on October 31, 2010, at which time Plaintiff complained of general body aches and requested pain medication. Id. The examination showed the maceration was slowly resolving, and Tapper cleaned his foot and applied more antifungal cream. Id. Plaintiff was given another prescription for antifungal cream and pain medication and instructed to follow-up at sick call as needed as return to sick call if the condition did not improve. Id. The medical records reveal Plaintiff continued to be monitored by medical staff including Tapper on April 26, 2011, during sick call and chronic care appointments for a variety of conditions including care for his foot with regards to his diabetes until his release on June 15, 2011. Tapper declares the diabetic ulcer Plaintiff had between his toes on his right foot for which he was hospitalized was a serious medical condition. Tapper provided proper medical care by changing Plaintiff's dressings on his foot, applying the appropriate medication when needed, providing pain medication when needed and providing Plaintiff a prescription for antifungal cream when needed. Tapper declares Plaintiff never cried or pleaded with her for her help regarding his foot, and she never denied Plaintiff medical care or refused him bandages. Id. Tapper asserts that if Plaintiff had complained about his foot during pill line, she would have advised him to sign up for sick call the next day unless he was in severe pain for which she would have examined him after she finished pill line and recorded it in his medical records. Id. Further, Tapper declares she never used profanity or called Plaintiff a "crying baby ass nigger" as alleged. Id.

      Defendants also submitted the declaration of Lorenzo Guevara who declared she is currently employed as the Assistant Health Services Administrator and a Mid-Level Practitioner at the FCI

Edgefield. As part of her duties, she helps supervise the Health Services Department and provides medical care to inmates. (Guevara declaration). A review of the complaint reveals Plaintiff has alleged she lost a BP-8 and BP-9 he had submitted through his counselor in which he alleges staff misconduct by Tapper which stalled his administrative remedies process. Id. Guevara declares she never lost an Informal Resolution Form (BP-8 or an Administrative Remedy Request BP-9) submitted by Plaintiff to his counselor regarding allegation of misconduct by Tapper. Id. Any BP-8 that is received in the Health Services Department was responded to in a timely manner. Id. Guevara declares Plaintiff filed a BP-8 and BP-9 alleging she was losing his paperwork in reference to allegations against Tapper intentionally stalling his administrative remedy process. Id. The matter was investigated and response was provided from the Warden on April 15, 2011, revealing that all Informal Resolutions forms were addressed in a timely manner. Guevara asserts she never lost a BP-8 or BP-9 or any paperwork filed by Plaintiff and she never stalled his access to the grievance process. Id.

The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." Estelle v. Gamble, 429 U.S. 97, 102 (1976). This obligation arises from an inmate's complete dependence upon prison medical staff to provide essential medical service. Id. The duty to attend to prisoners' medical needs, however, does not presuppose "that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Id. at 105. Instead, it is only when prison officials have exhibited "deliberate indifference" to a prisoner's "serious Deliberate indifference is a very high standard. In Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), the Fourth Circuit Court of Appeals noted that treatment "must be so grossly incompetent,

inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness, medical needs" that the Eighth Amendment is offended. Id. at 104.

Deliberate indifference is a very high standard. In Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), the Fourth Circuit Court of Appeals noted that treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness, nevertheless, mere negligence or malpractice does not violate the Eighth Amendment." Unless medical needs were serious or life threatening, and the defendant was deliberately and intentionally indifferent to those needs of which he was aware at the time, the plaintiff may not prevail. Estelle, 429 U.S. 104; Farmer v. Brennan, 511 U.S. 825 (1994); Sosebee v. Murphy, 797 F.2d 179 (4th Cir. 1986). "A medical need is 'serious' if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention' or if denial of or a delay in treatment causes the inmate 'to suffer a life-long handicap or permanent loss.'" Coppage v. Mann, 906 F.Supp. 1025, 1037 (E.D.Va. 1995) (internal citations omitted).

Further, incorrect medical treatment, such as an incorrect diagnosis, is not actionable under 42 U.S.C. § 1983. Estelle v. Gamble, supra. Negligence, in general, is not actionable under 42 U.S.C. § 1983. See Daniels v. Williams, 474 U.S. 327, 328-36 & n. 3 (1986); Davidson v. Cannon, 474 U.S. 344, 345-48 (1986); Ruefly v. Landon, 825 F.2d 792, 793-94 (4th Cir.1987); and Pink v. Lester, 52 F.3d 73, 78 (4th Cir. 1995) (applying Daniels vs. Williams and Ruefly v. Landon: "The district court properly held that Daniels bars an action under § 1983 for negligent conduct."). Secondly, 42 U.S.C. § 1983 does not impose liability for violations of duties of care arising under state law. DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 200-03 (1989). Similarly,

medical malpractice is not actionable under 42 U.S.C. § 1983. Estelle v. Gamble, supra, at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.") See also Brooks v. Celeste, F. 3d 125 (6th Cir. 1994) (Although several courts prior to the Supreme Court's decision in Farmer v. Brennan, supra, held that "repeated acts of negligence could by themselves constitute deliberate indifference, Farmer teaches otherwise."); Sellers v. Henman, 41 F.3d 1100, 1103 (7th Cir. 1994) ("If act A committed by the X prison shows negligence but not deliberate indifference, and B the same, and likewise C, the prison is not guilty of deliberate indifference."); White v. Napoleon, 897 F.2d 103, 108-109 (3rd Cir. 1990); and Smart v. Villar, 547 F.2d 114 (10th Cir. 1976) (affirming summary dismissal).

Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice." Jackson v. Fair, 846 F. 2d 811, 817 (1st Cir. 1988). Although the provision of medical care by prison officials is not discretionary, the type and amount of medical care is discretionary. See Brown v. Thompson, 868 F. Supp. 326 (S.D.Ga. 1994). Further, a disagreement as to the proper treatment to be received does not in and of itself state a constitutional violation. See Smart v. Villar, 547 F. 2d 112 (10th Cir. 1976); Lamb v. Maschner, 633 F. Supp. 351, 353 (D.Kan. 1986). Mistakes of medical judgment are not subject to judicial review in a § 1983 action. Russell v. Sheffer, 528 F. 2d 318, 319 (4th Cir. 1975).

Plaintiff has failed to show that he was denied medical treatment. In fact, Plaintiff alleges in his complaint that Tapper examined him after the altercation, that it was not until the next day that he noticed his foot swelling, and that another nurse saw him who referred Plaintiff to the physician who had him hospitalized. In any event, Plaintiff received treatment and was hospitalized for the sore.

The medical evidence appears to relate the sore to his diabetes rather than the altercation. A review of the medical records reveal that when he saw Tapper after the altercation, Plaintiff would not speak. (Medical Records, Entry 39-14, pgs. 41-44). The medical records also reveal that his foot was checked, cleansed and dressing changed on several occasions by Defendant Tapper. (Id. at 83-87, 91). On October 13, 2010, the records reveal that Tapper changed the dressing, and there was no drainage. (Id. at 75). Plaintiff was seen by Dr. Lopez on October 15, 2010, and there is no notation that Plaintiff complained that Tapper or anyone in medical had refused to change his bandages. In the complaint, Plaintiff alleges that he was being given his insulin shots and, on two occasions while being administered his insulin shots by Tapper, he requested bandages. Further, while Plaintiff argues that he had to go to the medical department to receive the bandages when Tapper could have come to him, he was receiving treatment. Therefore, as held in Estelle, 429 U.S. at 107, a complaint of negligence in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Even if Plaintiff's allegations are true, he has shown nothing more than a disagreement with the medical treatment provided, not that he was completely denied medical treatment. Additionally, Plaintiff has failed to show that he had a serious medical need of which Defendants knew about and consciously ignored. Plaintiff has not shown that any conduct by these Defendants "shocks the conscious" as required by Miltier v. Beorn, supra. "Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice" Jackson v. Fair, supra. The type and amount of medical care is left to the discretion of prison officials as long as medical care is provided. Brown v. Thompson, supra. Any disagreement between an inmate and medical personnel generally fails to state a claim. Although there is nothing to indicate that there

were mistakes of medical judgment, even if shown, mistakes of medical judgment are not subject to judicial review in a § 1983 action. Russell v.Sheffer, supra.

Based on the evidence presented, there has been no deliberate indifference shown to the overall medical needs of the Plaintiff. For the above stated reasons, summary judgment should be granted in favor of Defendants on this issue.

As to the allegations raised that Defendant Guevara "lost" Plaintiff's BP-8 and BP-9 forms complaining about Defendant Tapper, the allegations fail. First, Plaintiff's allegations fail to state a claim. In the complaint, Plaintiff alleges that his counselor told him that Defendant Guevara lost his forms. This appears to be an allegation of negligence on Defendant Guevara's part but not a constitutional violation. Further, this allegation is conclusory at best. Additionally, Plaintiff's complaints about the grievance process fails as there is no constitutional right to participate in grievance proceedings. Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994).

## QUALIFIED IMMUNITY

Defendants argue they are entitled to qualified immunity. Although the burden of showing immunity remains on the Defendant, an early determination is desirable, since immunity provides complete protection from a lawsuit, including from extensive discovery or other preparation. When a Defendant asserts that he or she is completely immune from suit, the court must consider whether the defense meets the standard set forth by various courts which have considered the issue.

When a person is sued in his individual capacity, the court may consider whether that person is entitled to immunity from suit. Immunity is a defense to be asserted by the Defendant and the burden of proving entitlement to immunity rests with the Defendant asserting it. Once asserted,

however, the court should carefully consider whether the person is entitled to either absolute immunity (judicial and quasi-judicial, legislative) or qualified immunity. Once raised, immunity is a threshold issue, which should be addressed early in the action because if it can be shown to be a valid defense, the Defendant is entitled to dismissal or summary judgment. For that reason, the issue of immunity should be addressed before discovery is allowed.

> The doctrine of qualified immunity attempts to reconcile two potentially conflicting principles: the need to deter government officials from violating an individual's federal civil rights and the need for government officials to act decisively without undue fear of judicial second guessing.

Akers v. Caperton, 998 F.2d 220, 225-26 (4th Cir. 1993).

The Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800 (1982), established the standard which the court is to follow in determining whether Defendant is protected by this immunity.

> Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Harlow, 457 U.S. at 818.

In a discussion of qualified immunity, the Court of Appeals for the Fourth Circuit stated:

> Qualified immunity shields a governmental official from liability for civil monetary damages if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." "In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Moreover, "the manner in which this [clearly established] right applies to the actions of the official must also be apparent." As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

Wiley v. Doory, 14 F.3d 993 (4th Cir. 1994) (internal citations omitted), cert. denied, 516 U.S. 824 (1995).  As discussed above, the Plaintiff fails to show that Defendants violated any of his clearly established constitutional or statutory rights. Thus, the undersigned recommends that summary judgment be granted as to these Defendants.

## CONCLUSION

The Plaintiff has failed to show that Defendants violated any of his constitutional or statutory rights under 42 U.S.C. § 1983.  It is therefore, for the reasons stated herein,

RECOMMENDED that the motion filed by Defendants (document #39) for summary judgment be GRANTED IN ITS ENTIRETY and the case dismissed.

IT IS FURTHER RECOMMENDED that any outstanding motions be deemed MOOT.

Respectfully submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

January 26, 2012
Florence, South Carolina

**The parties' attention is directed to the important notice on the next page.**